*State of New York*
*Supreme Court, Appellate Division*
*Third Judicial Department*

Decided and Entered:  January 21, 2016                    519698
_____

RICHARD K. KENDALL et al.,
                    Appellants,

        v

AMICA MUTUAL INSURANCE COMPANY,
                    Respondent.

(Action No. 1.)
_____        MEMORANDUM AND ORDER

HOLLY KENDALL et al.,
                    Appellants,

        v

USA DECON et al.,
                    Respondents.

(Action No. 2.)
_____


Calendar Date:  November 23, 2015

Before:  Peters, P.J., McCarthy, Egan Jr., Devine and Clark, JJ.

                    _____


        Linnan & Fallon, LLP, Albany (Michael J. Hutter of Powers &
Santola, LLP, of counsel), for appellants.

        Carter, Conboy, Case, Blackmore, Maloney & Laird, PC,
Albany (Jessica A. Desany of counsel), for Amica Insurance
Company, respondent.

        A. Smith Law Group, LLP, New York City (Andrea J. Smith of
counsel), for USA Decon and another, respondents.

Wilson, Elser, Moskowitz, Edelman & Dicker, LLP, Albany (Benjamin F. Neidl of counsel), for Duct and Vent Cleaning of America, Inc., respondent.

_____

Egan Jr., J.

Appeal from an order of the Supreme Court (Teresi, J.), entered June 19, 2014 in Albany County, which, among other things, granted defendants' motions for summary judgment dismissing the complaint(s).

Plaintiffs own a three-level home in the Town of Colonie, Albany County; plaintiffs previously utilized the main and second floors of the structure as their residence and rented out the basement level to a young man and his fiancée. On the morning of April 5, 2009, the Colonie Police Department was told that the male tenant had barricaded himself in the basement apartment and allegedly was threatening suicide, and a patrol officer was dispatched to undertake a welfare check. Later that afternoon, and following unsuccessful attempts to voluntarily extricate the tenant from the apartment, a SWAT team fired CS tear gas canisters into plaintiffs' home. The tenant then was removed from the scene and transported to a local hospital.

Plaintiffs, who initially were not at home and thereafter watched the events unfold from a neighbor's property, returned to their home at approximately 9:00 p.m. When plaintiff Holly Kendall (hereinafter Kendall) went down to the basement to reset the cable box,[1] she began coughing and her eyes and skin started to burn. Although Kendall sought treatment at a local hospital, she left without being seen by a physician or otherwise receiving treatment. Kendall and her husband, plaintiff Richard K. Kendall, returned to their home later that evening and remained there until the following day. After staying with relatives for

_____

[1] Electrical service to the residence had been turned off earlier in the day at the request of law enforcement.

two days, plaintiffs moved into a local hotel, where they remained for the next 6½ months while their home was being remediated, repaired and cleaned.

As a result of the April 2009 incident, plaintiffs filed a claim with their homeowner's insurance carrier, defendant Amica Mutual Insurance Company; Amica, in turn, retained AEGIS Engineering Services to investigate plaintiffs' claim. Although AEGIS solicited bids from a number of remediation contractors, plaintiffs – independent of such efforts – identified and selected defendant USA Decon to perform the tear gas remediation. During the course of such work, which began on or about June 1, 2009 and lasted for approximately nine days, USA Decon employed various methods to clean plaintiffs' property, including utilizing a neutralizing agent known as "Get the Odor Out." As USA Decon was not licensed to perform heating, ventilation and cooling work, it subcontracted such work to defendant Duct and Vent Cleaning of America, Inc. During the course of its work on plaintiffs' property, Duct and Vent utilized a deodorizing agent known as "EnviroCon." The remediation work was completed in June 2009 and, when Kendall did a walk-through of the premises, she did not experience any symptoms. Post-remediation air quality testing conducted by the Occupational & Environmental Health Center of Eastern New York in June 2009 revealed "that the cleanup was thorough and the air in the residence [was] no longer contaminated by the effects of the CS tear gas and powder. No further sampling for CS tear gas [was] recommended."

Plaintiffs returned to their home in October 2009. Although Kendall purportedly began experiencing adverse health effects one month later, plaintiffs continued to live in their home until March 5, 2010, when Kendall allegedly was told by a physician at a local emergency room that she could not return to her residence. Plaintiffs again moved into a local hotel, and neither Kendall nor her spouse thereafter returned to the residence. Subsequent testing of plaintiffs' home for tear gas residue – conducted by Needham Risk Management in March 2010 – revealed that "[t]he analyte was detected but at a level too low to be accurately quantified by the method used." Plaintiffs, believing such testing to be invalid, hired Certified Decontamination in November 2010 to conduct further testing of

the residence for the presence of tear gas residue and any chemicals used during the decontamination process. Although the general manager of that company, Michael Rowzee, concluded that "the dwelling was not properly decontaminated [and] residue of at least one hazardous compound" remained, actual testing of the residence found no evidence of tear gas; similarly, no evidence of volatile organic compounds above an acceptable level were detected. Rowzee did report, however, that "[c]ompounds consistent with the decontamination of a dwelling using chlorine dioxide/chlorite were found," and that the symptoms reported by plaintiffs were "consistent with an overexposure to chlorine dioxide, sodium chlorite and sodium chlorate."

Plaintiffs commenced action No. 1 against Amica in June 2011 and served an amended complaint in November 2012 alleging, among other things, breach of contract. In the interim, plaintiffs commenced action No. 2 in April 2012 against Amica, Duct and Vent, USA Decon and its president, defendant Robert Demaret, alleging, among other things, negligence and toxic tort and seeking to recover for the injuries allegedly sustained.[2] Supreme Court granted Amica's subsequent motion to dismiss the complaint in action No. 1 as to the breach of contract cause of action, finding such claim to be time-barred, and joined the surviving causes of action with those asserted in action No. 2. Following discovery, defendants each moved for summary judgment dismissing the complaint(s) and any asserted cross claims against them. After reviewing the voluminous record before it, Supreme Court granted defendants' respective motions for summary judgment and dismissed the complaint(s) against them in their entirety. This appeal by plaintiffs ensued.[3]

_____

[2] Although action No. 2 also was commenced against Colonial Cleaners, such action subsequently was discontinued by stipulation upon the merits and with prejudice. Additionally, Kendall's spouse apparently discontinued his personal injury claims, leaving him with only a derivative claim based upon Kendall's asserted injuries.

[3] Although the parties raise various procedural issues with regard to the viability of certain of the claims and cross claims

We affirm. "It is well-established that an opinion on causation should set forth a plaintiff's exposure to a toxin, that the toxin is capable of causing the particular illness (general causation) and that [the] plaintiff was exposed to sufficient levels of the toxin to cause the illness [alleged] (specific causation)" (Parker v Mobil Oil Corp., 7 NY3d 434, 448 [2006]; see Cornell v 360 W. 51st St. Realty, LLC, 22 NY3d 762, 784 [2014]; Lindkvist v Travelers Ins., 111 AD3d 452, 452 [2013]; Nonnon v City of New York, 88 AD3d 384, 394 [2011]; Jackson v Nutmeg Tech., Inc., 43 AD3d 599, 601 [2007]). Although neither a "precise quantification" nor "an exact numerical value" is required in order to demonstrate specific causation, it remains "a plaintiff's burden to establish [that there was] sufficient exposure to a substance to cause the claimed adverse health effect" (Cornell v 360 W. 51st St. Realty, LLC, 22 NY3d at 784 [internal quotation marks and citation omitted]; see Ivory v International Bus. Machines Corp., 116 AD3d 121, 126 [2014], lv denied 23 NY3d 903 [2014]; Jackson v Nutmeg Tech., Inc., 43 AD3d at 602). As to the quality of proof required, "[t]he professional reliability exception to the hearsay rule . . . enables an expert witness to provide opinion evidence based on otherwise inadmissible hearsay, provided it is demonstrated to be the type of material commonly relied on in the profession" (Matter of Greene v Robarge, 104 AD3d 1073, 1074 [2013] [internal quotation marks and citation omitted]; see Matter of Dakota F.

---

asserted in action Nos. 1 and 2, as we are persuaded — for the reasons that follow — that Supreme Court's order should be affirmed in its entirety, we will address the substance of the claims asserted without parsing out the specific procedural arguments relative thereto. Additionally, as is apparent from a review of plaintiffs' brief and their verified bills of particulars, Kendall is alleging damages based upon exposure "to the remaining CS tear gas in [plaintiffs'] home and the toxic chemicals [allegedly used in the remediation and cleaning process] when they returned to live in their house in October 2009 through March 5, 2010." Hence, our analysis of the proof tendered in support of — and in opposition to — defendants' respective motions will be limited to this post-remediation period.

[Angela F.], 110 AD3d 1151, 1153 [2013], lv denied 22 NY3d 1015 [2013]; O'Brien v Mbugua, 49 AD3d 937, 938 [2008]). That said, "even if the reliability of the evidence is shown, it may not be the sole basis for the expert's opinion on an ultimate issue in the case, but rather it may only form a link in the chain of data which led the expert to his or her opinion" (O'Brien v Mbugua, 49 AD3d at 938 [internal quotation marks, brackets and citation omitted]; see Anderson v Dainack, 39 AD3d 1065, 1067 [2007]).

Here, in support of their respective motions for summary judgment, defendants submitted, among other things, the material safety data sheet for "Get the Odor Out," various laboratory analyses and test results, the examination before trial testimony of Kendall, her spouse, Demaret (USA Decon), John Van Raalte (Occupational & Environmental Health Center of Eastern New York), Timothy Gerardi (Amica) and Michael Vinick (Duct and Vent), as well as the expert affidavit and report of Jonathan Borak – a board-certified physician in internal medicine, occupational medicine and toxicology. Demaret and Vinick each described the extent of the work performed at plaintiffs' residence, including the substances utilized during the course of the remediation and cleaning processes. Notably, Demaret testified that he had utilized "Get the Odor Out" – an "effective, nontoxic product" – on approximately 500 properties and had never received a single complaint. According to Demaret, he and his crew wore personal protective equipment for the first three days of the remediation project but thereafter wore "shorts and T-shirts" without experiencing any adverse health effects. Finally, Demaret testified that when he and Kendall did the final walk-through, neither he nor Kendall displayed any symptoms of tear gas exposure. Vinick offered similar testimony as to the scope of the work performed at plaintiffs' residence, which was limited to cleaning the duct work, and stated that he had never received any complaints – from either his customers or his workers – of any ill effects stemming from the use of "EnviroCon" during cleaning operations. Vinick also testified that his employees did not complain of any symptoms of tear gas exposure as a result of performing work at plaintiffs' residence. As noted previously, post-remediation air quality testing – the parameters of which were described by Van Raalte at his deposition – revealed "that the cleanup was thorough and the air in the residence [was] no

longer contaminated by the effects of the CS tear gas and powder."

In addition to the foregoing, Borak provided a detailed affidavit and expert report relative to the issues of general and specific causation. Preliminarily, to the extent that plaintiffs take issue with the admissibility of certain of the test results and/or reports reviewed by Borak, we are satisfied that such documents are "the type of material[s] commonly relied on in the profession" (Matter of Greene v Robarge, 104 AD3d at 1074 [internal quotation marks and citation omitted]) and, further, that such materials were merely "a link in the chain of data" upon which Borak ultimately relied in forming his expert opinion (Anderson v Dainack, 39 AD3d at 1067 [internal quotation marks and citations omitted]). Accordingly, we discern no basis upon which to set aside Borak's expert opinion or report (compare Borden v Brady, 92 AD2d 983, 984 [1983]).

As to the substance of Borak's report, Borak readily acknowledged that Kendall was exposed to tear gas residue on April 5, 2009 (and most likely the following day as well) — as the result of which she "developed acute symptoms that were consistent with the expected acute effects of tear gas exposure." Borak further acknowledged that certain of the pulmonary symptoms of which Kendall now complains may have resulted from her acute exposure to tear gas on those dates. Borak noted, however, that there was no evidence that Kendall was exposed to tear gas residue following the remediation of plaintiffs' residence. Absent evidence of such exposure, plaintiffs simply cannot establish that Kendall "was exposed to sufficient levels of the toxin to cause the [pulmonary] illness [alleged] (specific causation)" (Parker v Mobil Oil Corp., 7 NY3d at 448). As to the balance of Kendall's physical complaints, Borak opined that it was "probable" that Kendall's "skin complaints since April 2009 represented relapses and flares of her lifelong eczema," noting that it would be "very unlikely" for CS tear gas to produce such symptoms six months after the initial exposure. Finally, Borak found "no evidence" to support a connection between Kendall's urinary and gynecological symptoms and exposure to CS tear gas.

With respect to the cleaning agents used, Borak noted that

there was "no evidence of residual chlorine dioxide, sodium chlorite or sodium chlorate in [plaintiffs'] home," and no "evidence that . . . Kendall suffered 'overexposure' to any of those agents." Additionally, Borak found "no evidence in the scientific literature that inhalation exposures to [the cited compounds were] associated with human pulmonary toxicity generally or [reactive airways dysfunction syndrome (the specific ailment alleged by Kendall)] in particular." Further review of the medical literature also disclosed "no evidence" and/or "no data" to support a causal connection between exposure to chlorine dioxide, chlorite salts or chlorate salts and Kendall's skin diseases, bladder infections or menstrual irregularities. Hence, Borak opined, there was no evidence to suggest that Kendall developed her various ailments as a result of any exposure to these particular compounds.

The foregoing proof is more than sufficient to demonstrate a lack of specific causation relative to Kendall's alleged post-remediation exposure to tear gas and, further, a lack of both general and specific causation as to Kendall's alleged exposure to the offending cleaning agents. Hence, defendants demonstrated their prima facie entitlement to judgment as a matter of law, thereby shifting the burden to plaintiffs to tender sufficient proof to raise a question of fact in this regard.

Simply put, neither the assessment submitted by Rowzee (Certified Decontamination) nor the affidavits tendered by plaintiffs' experts — John Quinn, Michael Klein and William Meggs — were sufficient as to, among other things, raise a question of fact relative to specific causation. The report authored by Rowzee reflects that no evidence of CS tear gas was found in plaintiffs' residence during his November 2010 inspection thereof. Although Rowzee indicated that "[c]ompounds consistent with the decontamination of a dwelling using chlorine dioxide/chlorite were found" in plaintiffs' residence, no attempt was made to quantify the levels thereof, much less demonstrate that such compounds existed in concentrations above acceptable levels. Klein, a professional engineer and certified hazardous materials manager, was critical of the remediation and cleaning processes, took issue with the cleaning agents employed and ultimately opined that the work was performed in a negligent

manner, but his report failed to document the presence of any contaminants in plaintiffs' home, nor did he make any causal connection between either the CS tear gas or the cleaning agents and Kendall's resulting injuries. Quinn, a chemist, was similarly critical of the cleaning agent employed during the tear gas remediation phase of the work but, again, offered no causal connection between the contaminants allegedly remaining in plaintiffs' residence and Kendall's asserted ailments. Finally, Meggs, a board-certified physician in, among other things, medical toxicology, opined that Kendall's "signs and symptoms [were] consistent with a reexposure to CS tear gas, albeit at lower doses than the doses classically associated with toxicity." Meggs affidavit, however, ignores the fact that the record before us is devoid of any scientific testing documenting the post-remediation presence of CS tear gas in plaintiffs' home. The record is similarly devoid of any measurable level of residual and allegedly hazardous cleaning agents in plaintiffs' home. Absent such proof — and without expert testimony establishing, among other things, specific causation between the alleged contaminants and Kendall's injuries — plaintiffs failed to raise questions of fact sufficient to defeat defendants' respective motions (see Cleghorne v City of New York, 99 AD3d 443, 447-448 [2012]; Coratti v Wella Corp., 56 AD3d 343, 343-344 [2008]; Nawrocki v Coastal Corp., 45 AD3d 1341, 1342 [2007], lv denied 10 NY3d 710 [2008]). As Supreme Court succinctly stated, "allegations of inadequacies in the decontamination process do[] not equate to the existence of CS tear gas or other chemicals in [p]laintiffs' home." Plaintiffs' remaining arguments, to the extent not specifically addressed, have been examined and found to be lacking in merit, and Amica's arguments relative to the cross claims asserted against it are, in light of our conclusions, academic.

Peters, P.J., McCarthy, Devine and Clark, JJ., concur.

ORDERED that the order is affirmed, with one bill of costs.

ENTER:

Robert D. Mayberger
Clerk of the Court