Nemeth v Brenntag N. Am. (2020 NY Slip Op 02261)





Nemeth v Brenntag N. Am.


2020 NY Slip Op 02261


Decided on April 9, 2020


Appellate Division, First Department


Gische J., J.



Published by New York State Law Reporting Bureau pursuant to Judiciary Law § 431.


This opinion is uncorrected and subject to revision before publication in the Official Reports.



Decided on April 9, 2020
SUPREME COURT, APPELLATE DIVISION
First Judicial Department

David Friedman,J.P.
Judith J. Gische
Barbara R. Kapnick
Anil C. Singh, JJ.


190138/14 9765 

[*1]Francis Nemeth, etc., Plaintiff-Respondent-Appellant,
v
Brenntag North America, etc., et al., Defendants, Whittaker, Clark & Daniels, Inc., Defendant-Appellant-Respondent.



Defendant appeals from the judgment of Supreme Court, New York County (Martin Shulman, J.), entered August 22, 2017, upon a jury verdict.




Simpson Thacher & Bartlett LLP, New York (Bryce L. Friedman and Eamonn W. Campbell of counsel), for appellant-respondent.
Levy Konigsberg LLP, New York (Renner K. Walker and Robert I. Komitor of counsel), for respondent-appellant.



GISCHE J.,


The most vexing issue framed by this appeal pertains to specific causation: was there sufficient evidence in the record for the jury to conclude that decedent, Florence Nemeth, was exposed to a quantity of asbestos causing her to contract peritoneal mesothelioma. As more fully explained below, the trial record contains sufficient evidence, consistent with the Court of Appeals' reasoning in Parker v Mobil Oil Corp. (7 NY3d 434 [2006]), to support the jury's verdict and conclusion that Nemeth was exposed to a sufficient quantity of asbestos to cause the disease.
Nemeth was diagnosed in November 2012 with peritoneal mesothelioma, a tumor of mesothelia cells in the gut or abdomen. She died shortly before this trial commenced. Desert [*2]Flower Talcum Powder (DFTP) was manufactured by codefendant Shulton, Inc. (Shulton) using raw talc. Whittaker, Clark & Daniels, Inc. (WCD), a distributor of minerals and pigments, supplied Shulton with raw talc. Plaintiff's claim, accepted by the jury, was that Nemeth was exposed to asbestos contaminated talc which WCD supplied to Shulton for its use in its production of DFTP, that WCD knew, or should have known, of such contamination, and that Nemeth's use of DFTP was a proximate cause of her peritoneal mesothelioma.
The jury found in favor of plaintiff, awarding the estate $15,000,000 and plaintiff's widower, $1,500,000 for loss of consortium. It apportioned fault, 50% to Shulton and 50% to WCD. WCD's motion for a judgment notwithstanding the verdict was granted by the trial court only to the extent of ordering a new trial on damages, unless plaintiff stipulated to reduced judgments in the respective amounts of $6,000,000 and $600,000. Plaintiff so stipulated. The motion was otherwise denied. After the court made adjustments pursuant to General Obligations Law § 15-108, the judgments entered against WCD were for $2,667,045.45 in favor of the estate and $266,704.55 in favor of decedent's spouse. WCD now appeals. Plaintiff cross-appeals, but only on issues related to damages.
WCD seeks Appellate Division review of the jury's determination of facts in accordance with two standards of review. It asks this Court to (1) examine the facts to determine whether the weight of the evidence comports with the verdict, and alternatively (2) to consider whether the evidence was insufficient as a matter of law, rendering the verdict utterly irrational (CPLR 4404[a]; Killon v Parotta, 28 NY3d 101, 108 [2016]). This Court may not disregard a jury verdict as against the weight of the evidence unless "the evidence preponderate[d] in favor of the [moving party] that [it] could not have been reached on any fair interpretation of the evidence" (id. at 107 [internal citation omitted]). The remedy for a verdict that is against the weight of the evidence is to remit for a new trial. Where, however, the jury verdict is found insufficient as a matter of law, we must determine that the verdict is utterly irrational, meaning there is no valid line of reasoning or permissible inferences from the evidence presented by which a rational person could reach the jury's conclusion (id. at 108). The remedy for an utterly irrational verdict is a judgment in favor of the moving party (id.).
WCD's additional argument, that plaintiff's counsel's closing remarks unfairly influenced the jury, requires the Court to consider whether those remarks were fair comment or, if not, so prejudicial that they deprived WCD of a fair trial, warranting a new trial in the interest of justice (see e.g. People v Galloway, 54 NY2d 396, 399 [1981]; see also Peters v Wallis, 135 AD3d 922, 923 [2d Dept 2016]). Other arguments by the parties are evaluated according to whether they constitute errors of law affecting the verdict (see Evans v Newark-Wayne Community Hosp, 35 AD2d 1071, 1072 [4th Dept 1970]).
Against these highly deferential standards of review, the relevant trial evidence in this case may be summarized as follows:
Nemeth testified in a preserved videotaped deposition that over an 11-year period, from at least 1960 until 1971, she powdered her body with DFTP every day after showering, using a powder puff for two minutes to apply it all over her body. The air she breathed in was "[v]ery dusty" and after powdering, she would spend an additional five minutes every day wiping down powder from the sink, toilet, and floor using a damp paper towel. The bathrooms of the apartments where she lived when she used DFTP were "tiny," only about "5x6," with no windows, and no ventilation. Nemeth finished a box of DFTP every two weeks.
Nemeth was diagnosed with peritoneal mesothelioma in November 2012, approximately 40 months before she died in March 2016. She underwent three surgeries in an attempt to remove the tumors, but the disease eventually spread to every organ in her abdomen. Nemeth underwent years of chemotherapy and on four separate occasions, her abdomen was drained of accumulated fluids. Eventually, Nemeth's cancer metastasized to her lung and she died after [*3]spending some time in hospice care.
Shulton's former employee, Wiz Kaenzig, testified [FN1] that during the relevant time (1969 through 1971), WCD supplied Shulton with talc that it used in its products, including DFTP. He also testified that 99% of the talc that Shulton used during a substantial period of that 11-year period was obtained from WCD.
Sean Fitzgerald, a geologist, testified for plaintiff. Fitzgerald opined that the talc sold by WCD to Shulton during the relevant time was regularly and consistently contaminated with releasable asbestos. In addition to reviewing historical testing information, maps, surveys and other testing data, Fitzgerald based his opinion on his own testing of talc ore obtained from WCD source mines.
Fitzgerald also obtained a vintage sample of DFTP and conducted releasibility studies on it. The test involved placing the sample into a "glove box," which is a sealed, plexiglass chamber fitted with gloves and a filter. He testified that this testing method simulated Nemeth's use of talc in a close environment. After the talc was agitated within the chamber, Fitzgerald analyzed the fibers that he collected from the filter and dust wipes. He estimated that as many as 2,760,000 individual asbestos fibers were released during that test.
Calculating Nemeth's use of DFTP over the time, duration and frequency of exposure that Nemeth testified to, Fitzgerald concluded that she would have been exposed to billions and trillions of asbestos fibers on account of her use of DFTP over the 11-year period. He contrasted that with 60,000 fibers per day that a person living in an urban area breathes in as a result of ambient asbestos. He concluded that the number of released asbestos fibers from DFTP were several orders of magnitude higher than that found in ambient air.
To establish that WCD was knowledgeable about asbestos during the relevant time, plaintiff relied upon historic information about the known dangers of asbestos in talc. David Rosner, PhD, a history professor, testified that as far back as 1935, there were published studies reporting tremolite (a form of asbestos), as a potential contaminant of talc, and the presence of asbestos-related diseases in talc workers. Rosner also testified that WCD distributed raw asbestos as part of its business model from the 1930's to the early 1960's, possibly into the early 1970's. He testified that despite WCD's presumptive awareness of these dangers, it did not warn its customers of them, nor did WCD advise its customers to, in turn, advise their end users of those hazards.
Jacqueline Moline, M.D., an internal medicine doctor specializing in occupational and environmental medicine, was plaintiff's principal expert witness on the issues of both general and specific causation. On the issue of general causation, Dr. Moline opined that even brief or low-level exposure to asbestos, including asbestos contaminated talcum powder, causes all types of mesothelioma (including both pleural and peritoneal mesothelioma); virtually all cases of mesothelioma are related to asbestos exposure; and that mesothelioma is a sentinel health event of exposure to asbestos, meaning its presence is evidence of asbestos exposure. She testified that there are no known safe levels of exposure to asbestos, even while acknowledging that exposure to asbestos in ambient air is not a causative agent for mesothelioma.
In reaching this conclusion, Dr. Moline relied on her clinical experience in treating hundreds of patients with mesothelioma and peer reviewed literature which included both epidemiological and case studies. She also relied on government standards and regulations pertaining to unacceptable levels of asbestos. Among the authorities she relied upon was the Welch article, a study of college-educated men with low levels of asbestos exposure who [*4]developed peritoneal mesothelioma, the Helsinki criteria, articles showing that tremolite-contaminated talc can cause asbestos related disease, a 1982 NIOSH study concerning talc miners and millers and their development of asbestos related disease, case studies including the Gordon, Fitzgerald and Millette study concerning a woman's use of asbestos-contaminated cosmetic talcum powder and mesothelioma, as well as a study of a 17-year-old boy who used asbestos contaminated talc and developed peritoneal mesothelioma.
Dr. Moline explained that although there were no specific epidemiological studies regarding asbestos contaminated cosmetic talc and peritoneal mesothelioma, she was able to draw her conclusion by analogy from other relevant epidemiological studies, because it is the asbestos and not the talc per se that causes the disease. In addition, Dr. Moline pointed out that although there are thousands of asbestos containing products, epidemiological studies are not necessarily performed for each and every product. She also relied on case studies of mesothelioma in patients after using asbestos contaminated talc products.
On the issue of specific causation, Dr. Moline concluded that Nemeth's peritoneal mesothelioma was caused by her exposure to asbestos in DFTP. Her opinion rested not only on her expertise and knowledge of the literature in the field, it was also founded on the facts, as presented to her in counsel's hypothetical question. Certain facts she relied on were derived from both Nemeth's and Fitzgerald's testimony. While there was no precise quantification of the amount of asbestos to which Nemeth was actually exposed, Dr. Moline's opinion was in large part based upon the timing, duration and frequency of Nemeth's use of DFTP, derived from Nemeth's testimony, the latency period from the time Nemeth used the product until the development of the disease, the dusty nature of talcum powder, proof presented at trial that the DFTP used by Nemeth was contaminated with asbestos, and Fitzgerald's releasibility analysis of DFTP and conclusion that it released asbestos fibers several orders of magnitude higher than what a person would be exposed to by breathing ambient air.
On its direct case WCD called Alan Seagrave, a geologist. Like Fitzgerald, he obtained some rock ore samples for testing to determine their asbestos contamination and tested them using X-ray diffraction. He reported that only two of the samples tested positive for such contamination.
WCD also called Suresh Moolgavkar, PhD, an epidemiologist to testify as an expert. The court, however, granted plaintiff's motion in limine, prohibiting Dr. Moolgavkar from giving any opinion about medical causation, which ruling is not challenged on appeal [FN2][FN3]. Dr. Moolgavkar [*5]gave testimony on general causation. He concluded that there was no general causative connection between asbestos and peritoneal mesothelioma in women. Dr. Moolgavkar opined that mesothelioma may occur spontaneously, due to some cellular mutation, and it can also be idiopathic, meaning that there is no explanation for why it happens. He also testified that age is a strong risk factor for most cancers and the risk of cancer increases very rapidly with age. Dr. Moolgavkar's testimony was based on epidemiological studies. Although Dr. Moolgavkar disagreed with Dr. Moline's conclusions, he did not testify that her methodology in reaching them is not generally accepted by the relevant scientific community. In fact, he affirmatively recognized in his November 2, 2015 letter/report that reliance on epidemiological studies is accepted methodology for evaluating causation questions.
Each of the parties' experts were cross-examined, pointing out limitations in the data relied upon and the testing methods utilized in reaching their opinions.
Before the case was submitted to the jury, the trial court determined that WCD's CPLR article 16 claims against all settling defendants, other than Shulton, would not be presented to the jury because WCD had failed to make a prima facie case against them. Although Shulton had also settled with plaintiff, the trial court found that a prima facie case against Shulton was presented at trial. Consequently, Shulton was the only settling defendant appearing on the jury verdict sheet for CPLR article 16 apportionment purposes.
Causation
A gateway causation issue raised by WCD concerns the sufficiency and/or weight of plaintiff's evidence proving that it supplied the asbestos contaminated talc contained in the product (DFTP) that Nemeth used. Plaintiff's geologic expert Sean Fitzgerald established through his analysis of an historical sample of DFTP that it was contaminated with asbestos. There was further testimony by Shulton's former employee that WCD sold talc to Shulton for use in its products, including DFTP, during the entire time Nemeth used DFTP. He further stated that WCD was virtually Shulton's exclusive (99%) supplier of talc during a significant portion of that time. There was also evidence by Fitzgerald that the mines supplying WCD with the talc it sold to Shulton were contaminated with asbestos. Fitzgerald's conclusions were based upon literature about the geology of the mines in question, historic and contemporary documents regarding testing of the ore from such mines, and his own actual testing of an exemplary ore sample.
In view of this evidence, a jury finding that Nemeth was exposed to asbestos contaminated talc supplied by WCD is not utterly irrational. Moreover, although defendant presented its own experts on the issue of asbestos contamination in WCD's talc, there is no basis to conclude that the evidence adduced by WCD so preponderated in its favor that a conclusion of asbestos contamination could not have been reached on any fair interpretation of the evidence. [*6]Hence, the jury finding that WCD supplied the offending asbestos contaminated talc was neither insufficient nor against the weight of the evidence.
Case Law on Causation
WCD predominantly argues that the evidence before the jury on general and specific causation was insufficient and against the weight of the evidence. Any analysis of causation in connection with toxic torts begins with the Court of Appeals' seminal case of Parker v Mobil Oil Corp. (7 NY3d 434 [2016], supra). Parker stands for the legal principle that any opinion on causation should set forth (1) a plaintiff's exposure to a toxin, (2) that the toxin is capable of causing a particular illness (general causation) and (3) that plaintiff was exposed to sufficient levels of the toxin to cause the illness (specific causation) (7 NY3d at 448). The underlying claim in Parker was that a gas station attendant had contracted acute myelogenous leukemia due to his exposure to benzene contained in gasoline. The Appellate Division dismissed the complaint based on the expert's inability to quantify the plaintiff's exposure to benzene or demonstrate that such exposure exceeded a threshold that would cause disease. Although the Court of Appeals affirmed dismissal in Parker, it expressly departed from the Appellate Division's analysis, holding that "it is not always necessary for a plaintiff to quantify exposure levels precisely or use the dose-response relationship, provided that whatever methods an expert uses to establish causation are generally accepted in the scientific community" (id. at 448).
The Court of Appeals recognized that precise information and exact details are not always available in toxic tort cases and they may not be necessary so long as there is "evidence from which a reasonable person could conclude" that the defendant's offending substance "has probably caused" the kind of harm of which the plaintiff complains (id. at 448-449). The Court went on to provide a nonexclusive list of several other ways an expert might demonstrate causation:
"For instance, amici note that the intensity of exposure to benzene may be more important than a cumulative dose for determining the risk of developing leukemia. Moreover, exposure can be estimated through the use of mathematical modeling by taking plaintiff's work history into account to estimate the exposure to a toxin. It is also possible that more qualitative means could be used to express a plaintiff's exposure. Comparison to the exposure levels of subjects of other studies could be helpful provided that the expert made a specific comparison sufficient to show how the plaintiff's exposure level related to those of the other subjects. These, along with others, could be potentially acceptable ways to demonstrate causation if they were found to be generally accepted as reliable in the scientific community" (id. at 449).
Parker is significant because it recognizes that mathematically precise quantification of exposure to a toxic substance, years after a plaintiff's exposure to such substance, may be impossible and, consequently, alternative means of proof should be available for an injured plaintiff to pursue what may otherwise be a valid claim. This recognition is particularly apt in asbestos exposure cases where the latency period between exposure and the onset of disease can be 20, 40 or 50 years (see Fusaro v Porter-Hayden, Co., 145 Misc 2d 911, 916 [Sup Ct, NY County 1989], affd 170 AD2d 239 [1st Dept 1991] [30-35 years])[FN4]. Following Parker, up [*7]until its decision in Matter of New York City Asbestos Litig. [Juni] (32 NY3d 1116 [2018]), the Court of Appeals continued to address causation in toxic tort cases, other than asbestos cases. In Cornell v 360 W. 51st St. Realty, LLC (22 NY3d 762 [2014]), a divided Court of Appeals (4-2) affirmed dismissal of the complaint alleging injury from exposure to mold because the plaintiff could not prove either general or specific causation. The majority, following the Parker analytic framework, held that the plaintiff's experts' opinion, that mold had an association or linkage to the respiratory ailments the plaintiff claimed to have suffered, was insufficient to establish general causation under Frye v United States (293 F 1013 [DC Cir 1923]). The Court elucidated that the Frye test for assessing the evidentiary reliability of scientific evidence focuses on principles and methodology. It further held that even though an expert, using reliable principles and methods, extrapolates his or her opinion from such reliable data, a court may still reject it based on Frye if there is simply too great an analytical gap between the data and the opinion proffered. While acknowledging its precedent that "precise quantification" of exposure is not necessary to prove specific causation, it held that a medical doctor's differential diagnosis was not enough to establish specific causation in the particular case before it (Cornell at 784, quoting Parker at 448).
In Sean R v BMW of N. Am., LLC (26 NY3d 801 [2016]), the Court of Appeals was confronted with a causation issue in connection with a plaintiff's claim that a fetus' in utero exposure to gasoline had caused the child's birth defects. The BMW driven by the mother while pregnant had a defective fuel hose, permitting gasoline fumes to escape into and permeate the interior of the car. The plaintiff testified that she could smell the gasoline and that she had experienced nausea, headaches and throat irritation. The plaintiff's expert opined that for symptoms such as these to occur immediately, there must have been a gasoline vapor concentration in the car of at least 1000 ppm, which is a toxic level. Applying the Parker analysis, the Court of Appeals upheld the preclusion of the expert testimony because the "methods" she used to reach her conclusion were not generally accepted as reliable within the scientific community (Sean R. at 806). Although the expert reached her conclusion relying on controlled studies that measured symptoms in response to a given exposure of gasoline, and the Court of Appeals acknowledged the reliability of the studies, it nevertheless held that the scientific community did not accept an inverse analysis derived from them. In other words, the studies failed to support the expert's conclusion that evidence of the symptoms permitted a conclusion that they were a result of exposure to a toxic concentration of gasoline vapor.
In discussing causation, the Court of Appeals in Sean R.
held:
"Although it is not always necessary for a plaintiff to quantify exposure levels precisely, we have never dispensed with a plaintiff's burden to establish sufficient exposure to a substance to cause the claimed adverse health effect. At a minimum there must be evidence from which the factfinder can conclude that plaintiff was exposed to levels of the agent that are known to cause the kind of harm that the plaintiff claims to have suffered. Not only is it necessary for a causation expert to establish that the plaintiff was exposed to sufficient levels of a toxin to have caused the injuries, but the expert must do so through methods found to be generally [*8]accepted as reliable in the scientific community. This general acceptance requirement, also known as the Frye test, governs the admissibility of expert testimony in New York" (id. at 808-809 [internal quotation marks, alterations and citation omitted]).
In accordance with Parker and its progeny, issues of causation in asbestos exposure cases were developing in the New York trial and appellate courts. In 2018 the Court of Appeals decided Juni, considering for the first time the issues of causation in connection with asbestos exposure and mesothelioma. To put Juni in context, it is informative to discuss the progression of asbestos causation case law as it had developed up until then in the Appellate Division and trial courts.[FN5]
A leading Appellate Division decision on causation in asbestos cases was Lustenring v AC & S, Inc. (13 AD3d 69 [1st Dept 2004], lv denied 4 NY3d 708 [2005]). Lustenring held that evidence of the plaintiff working all day and for prolonged periods of time "in clouds of dust" resulting from the manipulation and crushing of packing and gaskets containing asbestos, along with expert testimony that the dust was from asbestos and not just industrial air in general, supported a conclusion that the dust contained enough asbestos to cause mesothelioma (13 AD3d at 70). Although Lustenring was decided before Parker, the causation analysis in Lustenring continued to be applied by the Appellate Division and the trial courts even after Parker and its Court of Appeals progeny were decided (see Matter of New York City Asbestos Litig. [Sweberg], 2015 NY Slip Op 30043[U], at *5 [Sup Ct, NY County 2015], affd as modified 143 AD3d 483 [1st Dept 2016], lv dismissed 28 NY3d 11165 [2017]; Matter of New York City Asbestos Litig. [Hackshaw] 143 AD3d 485 [1st Dept 2016]; affd 29 NY3d 1068 [2017]); Penn v Amchem Prods., 85 AD3d 475 [1st Dept 2011]). Analytical support for the Lustenring analysis seemed to flow from and is consistent with Parker's express acknowledgment that exposure to a toxic substance can be "estimated" based upon a plaintiff's "work history" (Parker at 590-591).
In 2017, this Court decided Juni (148 AD3d 233 [1st Dept 2017]). Arthur Juni claimed that his mesothelioma was proximately caused by his exposure, as an auto mechanic, to asbestos dust released from brakes, clutches and manifold gaskets on Ford vehicles he had worked on. The four Justices deciding the case at the Appellate Division split on the issue of causation; two Justices finding insufficient evidence of specific causation, one Justice finding, in a separate concurrence, neither specific nor general causation, and the one Justice dissenting, finding that the trial evidence on causation was sufficient under Parker to support the jury verdict. The Appellate Division dissent was in large part founded on the analytical framework in Lustenring.
Significantly, the Juni majority analysis of specific causation did not hold that Lustenring was no longer valid law in light of Parker and its progeny, nor did it overrule Lustenring. Instead, the majority distinguished the circumstances in Lustenring from Juni and explained it within the rubric of a Parker based analysis as follows:
"Moreover, our decisions in Lustenring v AC & S, Inc., (13 AD3d 69 [2004], supra) and other asbestos cases (see e.g. Penn v Amchem Prods., 85 AD3d 475, 476 [1st Dept 2011]; Matter of New York Asbestos Litig., 28 AD3d 255, 256 [1st Dept 2006]) do not justify allowing a judgment in an asbestos case to stand solely on a bare conclusion that because the plaintiff worked with the defendant's asbestos-containing products, those products were a contributing cause of plaintiff's mesothelioma. The rulings in each of those cases are based on their discrete facts. Where the courts relied on evidence linking visible dust to the use of the particular defendant's product, expert testimony established that the extent and quantity of the dust to which the plaintiffs had been exposed contained enough asbestos to cause the mesothelioma. In none of those cases was the mere presence of visible dust considered sufficient alone to prove causation. For example in Lustenring, the evidence established that both plaintiffs worked all day for long periods in clouds of dust,' which the expert testimony stated necessarily contain[ed] enough asbestos to cause mesothelioma" (Juni at 238-239 [emphasis added], quoting Lustenring at 90).
At the Appellate Division, the Juni majority adopted a narrow reading of Lustenring, while the dissent read Lustenring more broadly.
In 2018, a plurality of a five judge panel at the Court of Appeals affirmed Juni, but not in accordance with the reasoning of the Appellate Division's majority. Of the four judges voting to affirm, two joined in a memorandum decision holding that proximate causation had not been legally established in accordance with Parker and Cornell; one judge separately concurred, stating that there was insufficient legal evidence establishing a connection between the defendant's products and the plaintiff's exposure to asbestos, expressly pointing out that he did not reach the issues of general or specific causation that had been reached by the Appellate Division. The fourth judge forming the plurality also wrote separately, explaining he concurred because there was a failure in proof on the issue of general causation. The concurrence rested on the defendant's unrebutted evidence that the friction products to which the plaintiff had been exposed were manufactured under extreme temperatures, changing the chemical composition of the asbestos in them to a biologically inert substance called forsterite. None of the separate decisions comprising the plurality endorsed or rejected the reasoning of Lustenring. They did not address the issue of specific causation. The sole dissenting judge primarily relied upon the reasoning of the Appellate Division dissent in Juni (32 NY3d at 1118-1122).
After the Appellate Division decision in Juni and its affirmance by the Court of Appeals, this Court continued to apply the Appellate Division decision in Juni, with varying results (Ford v A.O. Smith Water Prods., 173 AD3d 602 [1st Dept 2019][causation]; Matter of New York City Asbestos Litig. [DiScala], 173 AD3d 573 [1st Dept 2019]; Corazza v Amchem Prods., Inc., 170 AD3d 610 [1st Dept 2019] [no causation]; Matter of New York City Asbestos Litig. [Miller], 154 AD3d 441 [1st Dept 2017], lv denied 30 NY3d 909 [2018][causation]).
It is in consideration of this case law that the parties' arguments on general and specific causation in this case are evaluated.
General Causation
As previously stated, Dr. Moline testified that asbestos in talc is capable of causing peritoneal mesothelioma. Her opinion was based upon peer reviewed articles that reported epidemiological studies, case studies, review of governmental and international agency positions [*9]on asbestos safety, and her personal clinical experience treating numerous patients stricken with mesothelioma.
WCD claims to challenge Dr. Moline's methodology in arriving at her conclusion. WCD, however, presented no evidence whatsoever that Dr. Moline's reliance on scientific and other germane literature in the field was not generally accepted in the relevant scientific community (see Cornell, 22 NY3d at 782). In fact, WCD's expert, Dr. Moolgavkar, acknowledged in his November 2, 2015 letter/report that reliance on epidemiological studies to reach conclusions on causation in asbestos exposure cases is generally accepted in the relevant scientific community [FN6]. Also, contrary to WCD's arguments, Dr. Moline's testimony did not simply "associate" or "link" asbestos to mesothelioma, she described it as a sentinel health event of asbestos exposure, and that virtually all cases of mesothelioma are related to asbestos exposure. WCD fails to identify any analytical gap between the data Dr. Moline relied on and her opinion (id. at 781). Accordingly, there is no evidence supporting WCD's Frye reliability arguments.
At their core, WCD's arguments are not lodged at the legal sufficiency of the evidence, but its weight. WCD complains that the studies Dr. Moline relies on do not specifically concern the use of cosmetic talc and/or in unrelated to peritoneal as opposed to pleural mesothelioma. Dr. Moline testified however, that studies do not exist for every type of asbestos-containing product and it is the asbestos contamination of the talc that causes the disease. She further explained that her opinion was partly extrapolated from a case study concerning asbestos contaminated talc ore and its effect on miners and millers who were exposed to such talc. WCD's expert on general causation, Dr. Moolgavkar, also relied on epidemiological studies in reaching his conclusion that there is no association between asbestos contaminated talc and peritoneal mesothelioma in women. He admitted, however, that the studies he relied on only concerned men, and did not concern peritoneal mesothelioma or cosmetic talc. After each sides' attorney highlighted the weaknesses in the other sides' expert's scientific evidence and authorities, it then became the province of the jury to weigh the evidence and decide which opinion was more credible (see Monroy v Glavas, 57 AD3d 631, 632 [2d Dept 2008]). There is no legal basis to disturb the jury's findings and verdict in favor of plaintiff (see Naseer v Dynasty Home Improvement, 117 AD3d 623 [1st Dept 2014]).
Specific Causation
Dr. Moline, as plaintiff's expert on specific causation, testified in court that Nemeth's exposure to asbestos contaminated talc in DFTP caused Nemeth's peritoneal mesothelioma. Her testimony was in response to a hypothetical question posed by plaintiff's counsel, which included evidence in the trial record. WCD's primary argument is that Dr. Moline's opinion on specific causation is legally insufficient in that it fails to satisfy the quantification element.
Although Dr. Moline did not precisely quantify the amount of asbestos contaminated talc Nemeth was exposed to when using DFTP, Dr. Moline's conclusion was based upon Nemeth's estimated exposure to such toxin, as derived from Nemeth's own testimony about the timing, [*10]frequency and duration of her historical use of DFTP. Dr. Moline also took into consideration the results of Fitzgerald's testing of an historical sample of DFTP quantifying the number of asbestos fibers released from DFTP in a simulated setting. Thus, the extrapolation of Nemeth's exposure levels is sufficient to produce an estimate, consistent with Parker.[FN7]
In Juni, the Court of Appeals did not decide the issue of specific causation. Juni is a factually unique decision that does not impact on the specific causation issues raised in this case. To the extent the Appellate Division decision in Juni provides some general parameters for evaluating the legal sufficiency of specific causation in asbestos cases, this case passes muster, whether the broad interpretation of Parker and Lustenring followed by the Juni dissent is accepted, or the more narrow interpretation of Parker and Lustenring adopted by the Appellate Division majority is applied. Nemeth's testimony established, first hand, her personal history of prolonged exposure to visible dust (Lustenring at 70), beyond what is contained in ambient air. This would be sufficient to create a jury question under the reasoning of the Appellate Division dissent in Juni (148 AD3d at 243 [Feinman, J., dissenting]).
However, even under the Appellate Division's majority opinion in Juni, stating that expert testimony on quantification is necessary to show that such dust "contained enough asbestos to cause the mesothelioma" (id. at 239), that quantification requirement is sufficiently met here to create a jury question. Fitzgerald's testimony about the amount of asbestos released in a glove box analysis of DFTP, along with the timing, duration and frequency of Nemeth's use of that product, with his conclusion that the amount of asbestos greatly exceeded by "several [orders] of magnitude" the amount of asbestos fibers in ambient air, presents a sound basis for the jury's conclusion. Contrary to WCD's argument, Juni in no way affected Parker's holding that
precise quantification is not required in toxic tort cases.
WCD's alternative argument, that Dr. Moline's opinion is against the weight of the evidence, should be rejected. WCD did not produce any expert evidence on the issue of medical or specific causation. There is no basis, in this record, for a finding that the weight of the evidence presented at trial preponderated in favor of finding no specific causation.
Plaintiff's Summation
WCD's argument that plaintiff's counsel's remarks on summation deprived it of a fair trial and improperly influenced the jury is rejected. The following testimony, relevant to this argument, was elicited at trial:
On direct examination, Dr. Moline testified, without objection, that women have another route of potential exposure to asbestos because the talc can get into the body through vaginal excursion into the abdominal cavity through the uterus, fallopian tubes and into the peritoneum. She also testified, without objection, that this physiological difference may explain "why peritoneal mesothelioma [rates] are actually higher . . . " in women, adding that "there is no reason to say that women are more likely to develop spontaneous tumors than men."
Based on this testimony, during a lengthy summation (spanning 136 pages of trial transcript) and covering a plethora of issues, plaintiff's counsel made the following remarks:
"asbestos can enter the body in various ways. With a woman like Flo [Nemeth], there are two avenues of exposure. And the way she [Dr. Moline] is describing, I will submit, means she's [Nemeth] getting asbestos in her body from two different ways, from breathing it in, and then using it all over her body, in her pelvic regions . . ."
Although defense counsel immediately objected, the court allowed plaintiff's counsel to complete his statement. Plaintiff's counsel continued as follows:
"[Dr. Moline] told us exactly how in a case of a woman like Flo with peritoneal mesothelioma, the asbestos can get to the peritoneum . . . ."
"And in this case, in Flo's case, they accumulated in the peritoneum. And that's where the disease took place. Not spontaneously, as if by magic. . . And [Dr. Moline] also testified that there was a second avenue of exposure that could occur. . . by the manner in which [Nemeth] applied it all to her body it entered her vagina, is what [Dr. Moline] said. So there is another avenue of exposure which led to the peritoneum."
WCD's subsequent motion for a mistrial was denied. Supreme Court agreed that Dr. Moline had not given an "affirmative opinion that [Nemeth's] peritoneal mesothelioma was caused by both breathing the Desert Flower Dusting Powder and having it enter her body transvaginally." The court observed, however, that Dr. Moline had, in fact, testified that transvaginal exposure to asbestos contaminated talc "can cause peritoneal mesothelioma," and Dr. Moline had testified it would "explain the phenomenon of why there are more cases of peritoneal mesothelioma in women than men."[FN8]
Nonetheless, to allay WCD's concerns and avoid any possible prejudice, the court instructed plaintiff's counsel to do a subsequent "mini-closing," allowing him to clarify his remarks. Plaintiff's counsel then made the following statement:
"We heard extensive evidence about air born [sic] particulate fibers. The fact that Flo Nemeth, she testified that she breathed this in over years. I then told you about and you were here when Dr. Moline testified based on articles she read about certain other avenues of exposure specific to women. And I reiterated that yesterday. But, what I would like you to do and what I — and what the evidence shows in this case is that we are focused on the air born [sic] particulate and the fact that Flo said she breathed that particulate in. Even though the literature may suggest something that Dr. Moline touched upon, the case is really about what was released into the air, tie that up with Mr. Fitzgerald's simulation. And I just wanted to reiterate that."
WCD claims that plaintiff's counsel's remarks improperly confused the jury because although plaintiff's "focus" was on Nemeth's "inhalation" of asbestos, transvaginal exposure was not eliminated as a possible means of exposure. WCD claims further that Dr Moline's testimony only generally causally linked transvaginal exposure to cancer, but plaintiff's counsel misrepresented the record by stating to the jury that Nemeth's transvaginal exposure to asbestos contaminated talc specifically caused her peritoneal mesothelioma.
Supreme Court carefully instructed the jury before opening statements and again before closing arguments that the remarks the attorneys make when addressing them are not evidence. The jurors were also correctly instructed that they had to decide the case based only upon the testimony of witnesses, photographs, documents and other exhibits introduced into evidence at trial. Jurors are presumed to follow the law as it is charged by the court (People v Davis, 58 NY2d 1102 [1983]).
In addition, it is well-settled law that attorneys are afforded "wide latitude" in presenting their arguments to a jury in summation (Gregware v City of New York, 132 AD3d 51, 61 [1st Dept 2015]; see People v Galloway, 54 NY2d at 399). Even where a remark is not fair comment, so long as it does not substantially prejudice a trial by improperly influencing the jury's verdict, there is no basis for granting a mistrial (Galloway, 54 NY2d at 401).
Plaintiff's counsel's summation comments were isolated remarks during a very lengthy summation. They were not pervasive, egregious or an obdurate pattern of remarks that inflamed the jury into believing that the focus of plaintiff's exposure to asbestos contaminated talc was other than airborne particulants that she had breathed in for many years (see People v Whaley, 70 AD3d 570, 571 [1st Dept 2010], lv denied 14 NY3d 894 [2010]; People v D'Alessandro, 184 AD2d 114, 118-119 [1st Dept 1992], lv denied 81 NY2d 884 [1993]). The remarks did not divert the jury's attention from the core issues they had to decide (Selzer v New York City Tr. Auth., 100 AD3d 157, 163 [1st Dept 2012]). Nor did they deprive WCD of substantial justice (compare Smith v Rudolph, 151 AD3d 58, 63 [1st Dept 2017][pattern of defense counsel's misconduct so pervasive as to deprive the plaintiff of a fair trial]). The remarks, as the trial court observed, directly pertained to testimony to which WCD failed to object. Defense counsel, could have, but made no effort to blunt Dr. Moline's testimony during his own summation (see e.g. Gregware v City of New York, 132 AD3d at 61).
The trial court's general jury instruction, that counsel's remarks should not be considered as evidence, ameliorated plaintiff's counsel's mischaracterization of evidence. Moreover, the trial court's decision allowing plaintiff's counsel to re-address the jury in a mini-closing, while perhaps not an ideal choice, was a sufficient cure to WCD's objection (see Avila v Robani Energy Inc. 12 AD3d 223, 223 [1st Dept 2004]). The trial judge, who was in the "best position" to evaluate any errors and decide whether, under the circumstances the verdict was affected by them, stated that he believed the comments had not been motivated by any "lack of good faith" (see Micallef v Miehle Co., Div. of Miehle-Goss Dexter, 39 NY2d 376, 381 [1976]). Since plaintiff had the right to close last, counsel's additional closing remarks were clarifying and little more than "fair comment upon the evidence" (Selzer, 100 AD3d at 163 [internal quotation marks omitted]). They do not warrant a mistrial.
Jury Instruction
Before deliberations, the court instructed the jury that it was to consider whether "defendant acted with reasonable care" taking into account the general custom or practice of others in the industry. It also instructed - over defense counsel's objection — that WCD, as a manufacturer, distributor or seller is held to the knowledge of an expert in its respective industry, based on the state of the art in the industry at the time of the sale and Nemeth's exposure to the product. WCD contends these instructions were inconsistent and confusing to the jury.
WCD's claim, that the Supreme Court erred when it gave the jury a "state of art charge" instructing them that WCD was held to the knowledge of an expert in its field, is unavailing. Equally unavailing is WCD's further argument that this instruction is inconsistent with the instruction that WCD was required to act with reasonable care. The state of the art instruction correctly specified the level of knowledge a defendant is required to have. As a distributor of minerals and pigments, including talc, WCD is expected to keep abreast of developments in the state of the art of its product through research, reports, scientific literature, and other available methods (Cover v Cohen, 61 NY2d 261, 274-275 [1984]; PJI 2:120, Comment; see Matter of New York City Asbestos Litig. [Sweberg], 2015 NY Slip Op 30043[U], at *5 [rejecting the defendant's posttrial argument that the court erred in so charging jury]). WCD did not preserve its inconsistency argument and, in any event, whether WCD acted with "reasonable care" depends on the knowledge WCD had, or should have had, per the state of the art instruction.
Damages
WCD's argument that the jury's allocation of equal blame to it and Shulton was insufficient and against the weight of the evidence, because Shulton manufactured and sold the DFTP that injured Nemeth, is unavailing. The jury heard evidence from which it could conclude that WCD supplied the asbestos contaminated talc used by Shulton in its products, and that WCD knew or should have known that the talc was contaminated. The jury fairly determined that WCD's conduct was a cause of Nemeth's injuries at least as great as Shulton, who manufactured and sold DFTP to Nemeth (see e.g. Stewart v Manhattan & Bronx Surface Tr. Operating Auth., 60 AD3d 445, 445-446 [1st Dept 2009]).
WCD also argues that the trial court improperly excluded other, settling, defendants from the jury verdict sheet, which would have allowed the jury to apportion liability to those defendants. The trial court, however, properly excluded all settling defendants except Shulton from the verdict sheet because WCD, which had the burden of proof, failed to present a prima facie case of liability against them (Matter of New York City Asbestos Litig. [Idell], 164 AD3d 1128, 1129 [1st Dept 2018], appeal dismissed 32 NY3d 1186 [2019]).
WCD's argument that the verdict, as reduced by the trial court, should be further reduced by this Court is without merit. Likewise, plaintiff's challenge to the reduction of the jury award by the trial court is also without merit. The trial court correctly adjusted the jury verdict so that it did not materially deviate from reasonable compensation (Donlon v City of New York, 284 AD2d [*11]13 [1st Dept 2001]). In addition, plaintiff, who stipulated to the reduced award in order to avoid retrial, is precluded from challenging the reduced award on appeal.
Issues raised by plaintiff on its cross appeal regarding the court's calculation of offsets for payments made by the settling defendants, however, do have merit. General Obligations Law § 15-108 requires that a judgment be adjusted by subtracting the greater of other tortfeasors' equitable share of the damages or the amount actually paid by them. Here, the trial court first subtracted $732,500 from the damage award, representing the amounts paid by all the settling defendants that were not on the verdict sheet. It then further reduced the jury award by 50%, representing the apportionment to Shulton made by the jury. While this may be the proper method where the equitable share of liability has been determined for some, but not all, of the settling defendants (see Williams v Niske, 81 NY2d 437, 444-445 [1993]), a different calculation applies when all the settling tortfeasors have been included in the apportionment of liability. In such cases, the aggregate method should be applied (Matter of New York City Asbestos Litig. [Brooklyn Nav. Shipyard Cases], 82 NY2d 342 [1993]). Although the jury did not apportion liability for the settling defendant's except Shulton, by expressly finding that WCD had not proven a prima facie case against them, the trial court effectively apportioned their liability at 0%. Under the aggregate method of calculation, the damages should only be reduced by the greater of 50% or the aggregate of all settling defendants (including Shulton). In this case, there appears to be no dispute that 50% was greater than the aggregate of all monies paid by all settling defendants. I would therefore increase the judgment to $3,300,000.
Accordingly the judgment of the Supreme Court, New York County (Martin Shulman, J.), entered August 22, 2017, upon a jury verdict awarding plaintiff the principal amount of $2,933,750 should be modified, on the law, to the extent of increasing the principal amount to $3,300,000, and otherwise affirmed, without costs.
All concur except Friedman, J.P. who
dissents in an Opinion.




FRIEDMAN, J.P. (dissenting)


As an intermediate appellate tribunal of the state of New York, this Court is bound to apply the law as it has been determined in previously decided cases of the state's highest tribunal, the Court of Appeals. It is not our role to anticipate a departure by the Court of Appeals from its own precedents. Moreover, to the extent the decisions of this Court might be inconsistent with those of the Court of Appeals, we are bound to follow the law as stated by the Court of Appeals, even if our own conflicting decisions are more recent.
I preface my dissent with the foregoing because it seems to me that the majority decides this appeal as if the Court of Appeals had already overruled its cases requiring the plaintiff in a toxic tort case to present expert evidence "show[ing], through generally accepted methodologies, that [she] was exposed to a sufficient amount of a toxin to have caused [her] injuries" (Sean R. v BMW of N. Am., LLC, 26 NY3d 801, 812 [2016]), and that such expert evidence, even though "not required to pinpoint exposure with complete precision," provide the factfinder with "a scientific expression of [the] exposure level" (Parker v Mobil Oil Corp., 7 NY3d 434, 449 [2006]; see also Sean R., 26 NY3d at 809 ["At a minimum, . . . there must be evidence from which the factfinder can conclude that the plaintiff was exposed to levels of th(e) agent that are known to cause the kind of harm that the plaintiff claims to have suffered"] [internal quotation marks omitted]).
Plaintiff won a jury verdict against defendant Whitaker, Clark & Daniels (WCD) on the theory that his late wife, Florence Nemeth, died from peritoneal mesothelioma that resulted from her respiration of asbestos contained in Desert Flower Dusting Powder (Desert Flower), a cosmetic talcum powder that she used from 1960 through 1971. During that period, WCD [*12]supplied talc — allegedly naturally contaminated with asbestos — that was used to manufacture Desert Flower [FN9]. At trial, however, plaintiff failed to present expert evidence specifying the level of exposure to respirable asbestos that would have been sufficient to cause peritoneal mesothelioma, the specific cancer that afflicted Mrs. Nemeth [FN10]. Indeed, plaintiff's medical expert on causation admitted that her report did not offer any numerical definition of a "significant exposure" to asbestos. While this omission, by itself, renders plaintiff's evidence on causation legally insufficient, plaintiff's experts also failed to quantify the level of Mrs. Nemeth's actual exposure to asbestos — that is to say, they offered no estimate of the amount of asbestos she actually would have breathed in while using Desert Flower in a space with the dimensions and air conditions of her bathroom [FN11]. As more fully discussed below, under the governing precedents of the Court of Appeals, plaintiff's evidence falls short of establishing that Mrs. Nemeth "was exposed to sufficient levels of the toxin to cause the illness (specific causation)" (Parker, 7 NY3d at 448). For that reason, the judgment in favor of plaintiff should be reversed and WCD's motion for judgment notwithstanding the verdict pursuant to CPLR 4404(a) should be granted. Accordingly, I respectfully dissent.[FN12]
To state the obvious, if a litigant wishes to prove that "[a person] was exposed to sufficient levels of [a particular] toxin to cause [a particular] illness" (id.), the litigant must first establish the level of exposure to the particular toxin that is sufficient to cause the particular illness [FN13]. This threshold showing — evidence of the level of exposure to respirable asbestos that would have been sufficient to have caused Mrs. Nemeth's peritoneal cancer — is entirely absent from the record of this case. The omission is evident from the majority's detailed opinion, which identifies nothing in the record offering even an approximation of the level of asbestos exposure (whether cumulative or otherwise) that would have been capable of causing peritoneal mesothelioma. To be sure, this is not due to any oversight on the part of the majority, since the same gap is evident in plaintiff's appellate briefs and in the written report by his medical expert on causation, Jacqueline Moline, M.D.
Strikingly, although the transcript of Dr. Moline's trial testimony stretches through almost a thousand pages of the record, none of the portions of that testimony to which plaintiff refers us on appeal offers a "scientific expression" (id. at 449) of an estimate of the level of exposure that could have caused Mrs. Nemeth's disease. On this point, the best Dr. Moline could manage was to opine that "brief or low level exposures of asbestos" could "cause" peritoneal mesothelioma, and that, for this purpose, an exposure is "significant" if it has "some element of regularity or very high exposure over a shorter period of time." As previously noted, Dr. Moline admitted that, in her report, she did not define by "any numeral [sic] value" what she believed would constitute a "significant" asbestos exposure. Nor of course did she define by any numerical values what "brief or low level exposures of asbestos" could cause peritoneal mesothelioma. She also admitted that "not every inhalation of asbestos fibers results in peritoneal mesothelioma," and that "some exposures to asbestos . . . are trivial and don't increase a person's risk of developing mesothelioma."
Further, Dr. Moline's vague assessment of the level of exposure sufficient to cause peritoneal mesothelioma is not clarified by the scientific literature on which she relied in her testimony. Critically, not one of the articles Dr. Moline discussed on the witness stand (she mentioned none in her written report) sets forth an estimate of the minimum level of exposure to respirable asbestos (cumulative or otherwise) that would suffice to cause peritoneal mesothelioma. For example, the article discussed by Dr. Moline that most directly addresses the connection between asbestos and peritoneal mesothelioma is a study (the Welch article) of college-educated men with a history of "low level" asbestos exposure who developed peritoneal mesothelioma. As described by Dr. Moline, however, the Welch article concludes only that low-level asbestos exposure is "associated with an increased risk over six fold" (emphasis added) of developing the disease. Thus, by her own account, the Welch article merely describes an association between low levels of asbestos exposure and peritoneal mesothelioma, and does not [*13]purport to prove that such exposure was the cause of the disease (see Cornell v 360 W. 51st St. Realty, LLC, 22 NY3d 762, 783 [2014] ["an association does not necessarily mean that there is a cause-effect relationship"] [internal quotation marks and emphasis omitted]). Moreover, Dr. Moline did not reveal how the Welch article defines or quantifies what its authors deemed to constitute low-level asbestos exposure — and, therefore, she necessarily could not discuss how the levels of exposure discussed in the article relate to Mrs. Nemeth's alleged exposure.
Dr. Moline also discussed an article entitled "Consensus report: Asbestos, asbestosis, and cancer: the Helsinki criteria for diagnosis and attribution" (the Helsinki article). The Helsinki article, after stating that "a history of significant occupational, domestic, or environmental exposure to asbestos will suffice for attribution" of pleural mesothelioma to such exposure (emphasis added), continues: "There is evidence that peritoneal mesotheliomas are associated with higher levels of asbestos exposure than pleural mesotheliomas are" (emphasis added). The Helsinki article does not define what its authors deemed to constitute a "significant" exposure. A third article Dr. Moline discussed (the Andrion article) is a single-case study of the fatal peritoneal mesothelioma of a 17-year-old boy who was reported by his mother to have had the "curious habit" of "us[ing] large quantities of cosmetic talc daily," from "the age of 9 until about the age of 12." The Andrion article does not attempt to quantify the level of the deceased boy's environmental asbestos exposure, and cautions that "definite proof of the asbestos-related nature of this [malignant mesothelioma] cannot be established with certainty[.]"[FN14]
There is no merit to the majority's implicit attribution to me (in footnote 6 of its opinion) of the position that causation in a toxic tort case cannot be proved through epidemiological studies [FN15]. The deficiency in plaintiff's scientific evidence on the causation issue in this case is [*14]that, as described by plaintiff's medical expert, none of the articles on which she relied — even the ones that were epidemiological in nature (and a number of them plainly were not) — purport to estimate, based on epidemiological data, the level of asbestos exposure sufficient to cause peritoneal mesothelioma [FN16]. Dr. Moline did not discuss in her testimony any epidemiological study setting forth such an estimate.
Even if plaintiff had established the level of asbestos exposure sufficient to cause peritoneal mesothelioma — which, for the reasons just discussed, he did not — his evidence of specific causation still would have been legally insufficient by reason of his failure to offer a "scientific expression" (Parker, 7 NY3d at 449) of Mrs. Nemeth's actual level of exposure to respirable asbestos. Plaintiff's geological expert, Sean Fitzgerald, measured the release of asbestos when he simulated Mrs. Nemeth's use of Desert Flower (as described in her deposition testimony) in a glove box [FN17]. Mr. Fitzgerald estimated, based on this test, that 2,760,000 asbestos fibers were released each time Mrs. Nemeth used Desert Flower, and he asserted that this was "thousands of times" the level of asbestos permitted in schools and "several [orders] of magnitude higher" than the ambient level of airborne asbestos. Dr. Moline relied on these estimates in rendering her opinion on medical causation.
The deficiency of Mr. Fitzgerald's analysis based on the glove box test — again, putting aside for the moment that plaintiff never made the threshold showing of the level of asbestos exposure sufficient to cause peritoneal mesothelioma — is that Mr. Fitzgerald, by his own admission, estimated only the amount of asbestos released upon each application of Desert Flower, not the amount of asbestos to which Mrs. Nemeth actually would have been exposed, in a space having the same size and air conditions as her bathroom, by breathing it in. As Mr. Fitzgerald testified,
"[M]y test was just to see if countable structures of asbestos were releasable from the product, period. I wasn't actually trying to simulate the entire environment. I just wanted to see if simulation of using the material would cause asbestos in the talc, if present, to be released into the air."
Consistent with this concession by Mr. Fitzgerald, Dr. Moline (who relied on Mr. Fitzgerald's "releasability" analysis) admitted that she was unaware of either the daily or lifetime dose of asbestos to which a person would be exposed by using Desert Flower. In short, the [*15]"releasability" that Mr. Fitzgerald estimated in a glove box is not a measure of Mrs. Nemeth's actual exposure to asbestos in a bathroom, since she could have been harmed only by the asbestos fibers that she actually breathed in.[FN18]
At this juncture, it should be noted that, at the close of the evidence, plaintiff successfully opposed WCD's request that the jury be asked to apportion fault among WCD and all of the settling defendants, not just between WCD and Shulton, the manufacturer of Desert Flower. Thus, plaintiff cannot (and does not) rely on the theory that the asbestos from Desert Flower and the asbestos from the other alleged sources of Mrs. Nemeth's asbestos exposure were all substantially contributing causes of her injuries [FN19]. Because Desert Flower was the only potential [*16]source of asbestos exposure that the jury was asked to consider, plaintiff was required to prove that the asbestos from Desert Flower was sufficient to cause peritoneal mesothelioma.
Moreover, the vague, conclusory and subjective terms in which plaintiff's experts characterized both the level of asbestos exposure sufficient to cause peritoneal mesothelioma ("brief and low level") and the level of asbestos exposure to which Mrs. Nemeth allegedly was subjected ("several [orders] of magnitude higher" than the ambient; "thousands of times" the level permitted in schools) do not fulfill the Court of Appeals' requirement of a "scientific expression" (Parker, 7 NY3d at 449). Indeed, these are precisely the kinds of expressions the Court of Appeals has found wanting. For example, Parker rejected as "insufficient" a medical expert's report that the plaintiff "was frequently' exposed to excessive' amounts of gasoline and had extensive exposures . . . in both liquid and vapor form'"(id.) The Court held that these statements, "even given that an expert is not required to pinpoint exposure with complete precision[,] cannot be characterized as a scientific expression of [the plaintiff's] exposure level" (id.; see also Cornell, 22 NY3d at 784 [rejecting an expert opinion that, among other deficiencies, "made no effort to quantify (the plaintiff's) level of exposure" to a mixture of microbial contaminants that allegedly infested her apartment, and instead "simply asserted . . . that she was unquestionably exposed to unsanitary conditions'"]).
Similarly, Parker, even while clarifying that "the amount of exposure need [not] be quantified exactly" (7 NY3d at 449 [emphasis added]), found "plainly insufficient to establish causation" a medical expert's "general, subjective and conclusory assertion . . . that [the plaintiff] had far more exposure to benzene [from gasoline while working at gas stations] than did the refinery workers in the epidemiological studies'" that found an increased risk of leukemia among such workers (id.). The Court noted that the expert's comparison of the plaintiff's exposure level to that of the refinery workers in the studies "neither states the level of the refinery workers' exposure, nor specifies how [the plaintiff's] exposure exceeded it, thus lacking in epidemiological evidence to support the claim" (id.).
The Court of Appeals' criticisms of the plaintiff's use of the refinery studies in Parker apply with even greater force to Dr. Moline's statement in this case that the release of asbestos fibers Mr. Fitzgerald had estimated through the glove box test was "at levels at which multiple studies have shown elevated rates of mesothelioma." Dr. Moline never clarified which "studies" she was referring to, the exposure "levels" discussed in those studies, or whether the mesothelioma discussed in the studies was peritoneal, the variety relevant here, or pleural, the more common variety discussed in most of the literature. Further, as previously discussed, none of the studies discussed by Dr. Moline even set forth an estimate of the level of asbestos exposure sufficient to cause peritoneal mesothelioma.
As should be clear from language in the decision quoted by the majority itself, Parker's clarification that "an expert is not required to pinpoint exposure with complete precision" (id.) did not open the door to the sort of hazy language used by plaintiff's experts here. Parker suggested three methods by which an expert might attempt to establish causation where it is not possible to measure cumulative dose precisely — focusing on intensity of exposure rather than cumulative dose, mathematical modeling based on work history to estimate total exposure, and "[c]omparison to the exposure levels of subjects of other studies . . . provided that the expert made a specific comparison sufficient to show how the plaintiff's exposure level related to those of the other subjects" (id. [emphasis added]). In this case, plaintiff's expert utilized none of these methods.
To the extent Dr. Moline attempted to demonstrate causation based on the accepted fact [*17]that mesothelioma is usually caused by asbestos exposure, her testimony runs afoul of Sean R., in which the Court of Appeals rejected such an "inverse approach" to proof of causation — "working backwards from reported symptoms to divine an otherwise unknown concentration of [a toxin]" (26 NY3d at 810). Nor is the bare fact that there was "visible dust" in the air of Mrs. Nemeth's bathroom sufficient to prove causation in the absence of expert evidence "establish[ing] that the extent and quantity of the dust . . . contained enough asbestos to cause the mesothelioma" (Matter of New York City Asbestos Litig. [Juni], 148 AD3d 233, 239 [1st Dept 2017], affd 32 NY3d 1116 [2018]).
The Court of Appeals' common-sense recognition in Parker that absolute precision in measuring exposure levels will usually be unattainable in toxic tort cases is transformed by the majority into a license to prove causation without any attempt by plaintiff's experts to express even an estimate of the level of exposure in mathematical or scientific terms. Contrary to the majority's assertion, plaintiff's experts in this case did not offer an "estimate" of Mrs. Nemeth's level of exposure based on an "extrapolation" from the glove box test conducted by Mr. Fitzgerald or "by reference to estimation based upon work history and math models."[FN20] In essence, plaintiff's experts told the jury that the use of Desert Flower increased the asbestos level in Mrs. Nemeth's bathroom above that of the ambient air by some unspecified amount, and then speculated that this unquantified level of increased exposure was enough (at five minutes per day over about 11 years) to have caused peritoneal mesothelioma, even though no evidence had been presented to show the minimum level of exposure capable of causing that disease. This does not pass muster under Sean R., Cornell and Parker.
Needless to say, neither Mrs. Nemeth nor anyone else could be expected to have measured the level of toxins in the air of her bathroom in anticipation of receiving a diagnosis of mesothelioma 40 years in the future. Thus, there is neither basis nor merit to the majority's unfounded suggestion that I would require such direct measurement of a plaintiff's actual exposure while using a product. But to require a toxic-tort plaintiff to present scientific rough estimates of the relevant exposure levels (namely, the approximate level sufficient to cause the disease and the approximate level of the plaintiff's actual exposure) — which is what existing Court of Appeals precedent does reasonably require — does not, contrary to the majority's hyperbolic claim, "sound the death knell for most . . . asbestos exposure cases going forward."
We are bound by the law as stated by the Court of Appeals in Sean R., Cornell and Parker, none of which were disturbed by the Court of Appeals' more recent memorandum decision (joined by four Judges) affirming this Court in Juni (and reaffirming the law as stated in [*18]Parker and Cornell)[FN21]. The majority — in spite of its unpersuasive claim to be deciding this case consistently with existing Court of Appeals precedent — appears to discern in the two concurrences and the dissent on the Court of Appeals in Juni the possibility that the Court of Appeals may be about to change course in this area of the law. Even if the majority's implicit prognostication is correct, such a prospect should not affect our application of existing binding case law before the Court of Appeals has actually taken such a step. Further, as stated at the outset of this dissent, to the extent this Court's decisions have deviated from the standards of Sean R., Cornell and Parker, we are bound to follow the law as stated by the Court of Appeals, even if our own conflicting decisions are more recent [FN22]. Accordingly, the majority's reinterpretation of the decisions of the Court of Appeals in light of our own more recent case law seems to me to be an unsound approach. We should simply follow the Court of Appeals cases, whose application to the instant matter seems to me straightforward.
In my view, the foregoing establishes that plaintiff failed to present evidence sufficient to prove that Mrs. Nemeth's peritoneal mesothelioma was caused by respirable asbestos to which she was exposed by her use of Desert Flower. I therefore believe that we should reverse the judgment in favor plaintiff and grant WCD's motion for judgment notwithstanding the verdict. However, for the reasons discussed below, even if I concluded that the record contained sufficient evidence to support the verdict, I would vote to reverse and grant WCD a new trial.
From the outset, plaintiff's case against WCD was predicated on the claim that Mrs. Nemeth's exposure to asbestos from Desert Flower had come by way of respiration. In the course of Dr. Moline's lengthy testimony, however, plaintiff's counsel briefly questioned her about the aforementioned article entitled "Cosmetic Talc and Ovarian Cancer," which posits that ovarian cancer may result from pelvic exposure to asbestos in cosmetic powders. While Dr. Moline acknowledged that ovarian cancer "is not the type of cancer we're talking about in this particular case," she testified that the article was "significant" because it "describe[s] manners by which women in particular . . . can have exposure to talc," namely, through "transvaginal [*19]exposure," i.e., "through vaginal excursion up through into the abdominal cavity through the uterus, fallopian tubes and into the peritoneum." As the trial court later concluded, however, Dr. Moline never identified any study concluding that peritoneal mesothelioma in women may be caused by pelvic exposure to asbestos, nor did Dr. Moline herself opine to that effect.
Subsequently, in the course of his summation, plaintiff's counsel made the following statement to the jury:
"[Mrs. Nemeth] said she used [Desert Flower] all over her body. . . . [A]s Dr. Moline later explains, asbestos can enter the body in various ways. With a woman like [Mrs. Nemeth], there are two avenues of exposure. And the way she's describing, I will submit means she's getting asbestos in her body from two different ways, from breathing it in and then using it all over her body, in her pelvic region."
WCD's counsel's immediate objection to these comments was overruled. After the close of the summation, but before the jury was charged, WCD renewed this objection and moved for a mistrial. The court denied the request for a mistrial, but reserved decision on the underlying objection.
The next day, the court, having further deliberated on the matter, ruled that WCD's objection to the comments about pelvic exposure did indeed have merit. The court stated:
"You have to remind me, . . . but I don't believe that [Dr. Moline] gave an affirmative opinion that Mrs. Nemeth's peritoneal mesothelioma was caused by both breathing the Desert Flower Dusting Powder and having it enter her body transvaginally.
"I don't believe we got that specific opinion with precise facts to support that type of exposure and an understanding of how that type of exposure can cause peritoneal mesothelioma, pathophsyiologically, respectfully" (emphasis added).[FN23]
After plaintiff's counsel offered a defense of his comments, the court responded:
"We have no evidence of record despite the fact that you pointed out that he didn't object to that portion of [Dr. Moline's] testimony describing the [L]ancet article ["Cosmetic Talc and Ovarian Cancer"] . . . . And there was no specific causation opinion that this was a separate discrete entry point for purposes of causing [Mrs. Nemeth's] cancer. That's not here. So, in that context, the way it was presented [on summation], suggested to this jury that that was a separate basis for it. And that's not this record, and, therefore, we need to clear [*20]that up."
Subsequently, the court reiterated: "There was no expert testimony that specifically establishes that exposure through the vagina was a substantial factor in causing her mesothelioma. . . . That's why I had concerns this morning."
Although the court ultimately determined that WCD had raised a meritorious objection to plaintiff's summation comments about pelvic exposure, the court did not take the usual course of issuing a curative instruction to negate the impact of the improper comment. Instead, the court suggested to plaintiff's counsel that he "revisit that issue in sort of like a mini-closing."
Plaintiff's counsel subsequently re-opened his summation and made the following comments on this issue:
"Exposure to the talc in this case. We heard extensive evidence about air born[e] particulate fibers. The fact that Flo Nemeth, she testified that she breathed this in over the years.
"I then told you about and you were here when Dr. Moline testified based on articles she read about certain other avenues of exposure specific to women. And I reiterated that yesterday. But, what I would like you to do and what I — and what the evidence shows in this case is that we are focused on the air born[e] particulate and the fact that Flo said she breathed that particulate in.
"Even though the literature may suggest something that Dr. Moline touched upon, the case is really about what was released into the air, tie that up with Mr. Fitzgerald's [glove box] simulation. And I just wanted to reiterate that."
After plaintiff's counsel's renewed summation, WCD renewed its motion for a mistrial, which the court denied. The court also denied WCD's request that the verdict sheet instruct the jury that, in order to return a verdict in favor of plaintiff, it was required to find that Mrs. Nemeth had been exposed to asbestos from Desert Flower by way of inhalation.
"It is fundamental that the jury must decide the issues on the evidence, and therefore fundamental that counsel, in summing up, must stay within the four corners of the evidence and avoid irrelevant comments which have no bearing on any legitimate issue in the case" (People v Ashwal, 39 NY2d 105, 109 [1976] [internal quotation marks and citation omitted]). Stated otherwise, a summation may not be "based on facts not in the record" (Selzer v New York City Tr. Auth., 100 AD3d 157, 163 [1st Dept 2012]). Here, even though the trial court initially overruled WCD's objection to plaintiff's counsel's comments concerning pelvic exposure, the court ultimately corrected itself when it recognized that those comments were not based on facts in the record because — as the court spelled out on the record in its statements quoted above — Dr. Moline never testified that asbestos absorbed transvaginally can lead to peritoneal mesothelioma (as opposed to ovarian cancer). Even the majority concedes that "plaintiff's counsel[] mischaracteriz[ed] [the] evidence" because, as the trial court "properly concluded," Dr. Moline "did not conclude that Nemeth's mesothelioma was caused by transvaginal exposure to asbestos in [Desert Flower]."[FN24]
Although the majority does not offer a defense on the merits of the summation remarks at issue, it takes the position that those remarks were not so prejudicial as to have deprived WCD of a fair trial. I disagree. The notion of a transvaginal avenue of exposure would have been intuitively appealing to laypersons, given that the pelvic region is obviously much closer to the peritoneum than are the nose and mouth — notwithstanding that, as the majority concedes, the scientific evidence in the record identified only exposure through the respiratory system as a possible cause of peritoneal mesothelioma. The pelvic exposure theory's intuitive appeal, the lack of evidence to connect such exposure to Mrs. Nemeth's disease, and the fact that the exposure issue went to the heart of the case — these factors combined to deprive WCD of a fair trial when plaintiff's counsel baselessly introduced the pelvic exposure theory into the case. Moreover, the dispositive question is whether the erroneous comment deprived the adverse party of a fair trial, not (as the majority seems to believe) whether the lawyer who made the improper comment did so in "good faith."[FN25]
While perhaps a curative instruction by the court would have been sufficient to negate the prejudicial effect of plaintiff's counsel's pelvic exposure comments, the court gave no such instruction. Instead, the court allowed plaintiff's counsel to reopen his summation to "revisit that issue" and "clear [it] up." Neither the majority nor plaintiff has found any precedent supporting the permissibility of allowing an attorney to reopen his closing to correct his own improper statements. In particular, the only case the majority cites on this point is one in which this Court found that an improper summation statement had been sufficiently remedied by a curative instruction given by the court (see Avila v Robani Energy Inc., 12 AD3d 223 [1st Dept 2004]).
Finally, plaintiff's counsel's "mini-closing" did nothing to cure the prejudice caused by his earlier improper statements, and arguably even worsened that prejudice. Counsel never explicitly disavowed the pelvic exposure theory — he simply recalled to the jury that he had discussed "certain other [than respiratory] avenues of exposure specific to women," and then said that "we are focused on the air born[e] particulate and the fact that Flo said she breathed that particulate in." Thus, after 21 days of trial, the very last thing the jury heard from one of the lawyers — a message likely to remain vivid in their minds when they retired to deliberate — was a reminder of the pelvic exposure theory, without an actual instruction to disregard it.
For the foregoing reasons, I believe that we should reverse the judgment and grant [*21]WCD's motion for judgment notwithstanding the verdict or, failing that, that we should reverse the judgment and grant WCD's motion for a new trial. Accordingly, I respectfully dissent.
Judgment of Supreme Court, New York County (Martin Shulman, J.), entered August 22, 2017, upon a jury verdict awarding plaintiff the principal amount of $2,933,750 should be modified, on the law, to the extent of increasing the principal amount to $3,300,000, and otherwise affirmed, without costs.
Opinion by Gische, J. All concur except Friedman, J.P., who dissents in an Opinion.
Friedman, J.P., Gische, Kapnick, Singh, JJ.
THIS CONSTITUTES THE DECISION AND ORDER
OF THE SUPREME COURT, APPELLATE DIVISION, FIRST DEPARTMENT.
ENTERED: APRIL 9, 2020
CLERK



Footnotes

Footnote 1:Kaenzig did not testify personally at trial. His recorded sworn testimony, taken in prior proceedings, was put before the jury.

Footnote 2:WCD claims that had the court permitted Dr. Moolgavkar to testify on specific causation, he would have opined that even if DFTP was contaminated with asbestos, it played no causative role in the development of Nemeth's peritoneal mesothelioma. The trial judge found that Dr. Moolgavkar did not possess the professional qualifications to render this opinion. Although WCD expresses its dissatisfaction with the trial court's ruling, no actual legal argument is raised challenging it and WCD has, therefore, abandoned whatever argument it may have had regarding that ruling (Stefkatos v Frezza, 95 AD3d 787 [1st Dept 2012]). In any event, the court's ruling that Dr. Moolgavkar did not possess the requisite qualifications to testify on causation was not a serious mistake (if a mistake at all), nor an error of law, nor an abuse of the trial court's discretion (Matter of Sylvestri, 44 NY2d 260, 268 [1978]; Meiselman v Crown Hgts. Hosp., 285 NY 389, 398 [1941]; Board. of Mgrs. of 195 Hudson St. Condominum v 195 Hudson St. Assoc., LLC, 63 AD3d 523, 524 [1st Dept 2009]).

Footnote 3:WCD likewise complains that the court improperly excluded Robert C. Adams, its dose reconstruction expert, without raising any express legal argument. The trial court ruling excluding Adams, however, was made without prejudice, permitting WCD the opportunity to establish that Adams's methodology was reliable. It did not seek to reintroduce its expert.

Footnote 4:Dr. Moline testified that the latency period for mesothelioma may be as long as 50 years. Dr. Moolgavkar also testified to long latency periods (40 years).

Footnote 5:Contrary to the dissent's argument, we are not suggesting that the Appellate Division and the trial courts have developed a body of law in contravention of Parker and its progeny. Nor are we, as the dissent suggests, forecasting that the Court of Appeals will change course in this area of the law To the contrary, it is our position that this Court and the trial courts' decisions are wholly consistent with Court of Appeals' precedent. Such precedent repeatedly acknowledges that precise information, and exact details are not the only way to prove causation.

Footnote 6: The dissent's argument that plaintiff's epidemiological studies are, as a matter of law, insufficient is without bases. Clearly no controlled dose response studies concerning unsafe levels of asbestos exposure can be ethically conducted in humans. This is also expressly recognized by Dr. Moolgavkar in his letter/report dated November 2, 2015. Consequently, both Dr. Moline and Dr. Moolgavkar primarily relied on epidemiological studies to reach their conclusions.

Footnote 7:The dissent's argument that the absence of a mathematical calculation of the amount of asbestos Nemeth was exposed to, as a matter of law, defeats her claim is inconsistent with case law. This approach, if adopted, would effectively sound the death knell for most, if not all, asbestos exposure cases going forward. Parker expressly leaves open a plaintiff's ability to prove specific causation without precise mathematical calculation, but by reference to estimation based on work history and math models, as was done here. Clearly, the mathematical proof that the dissent believes is required to prove specific causation in asbestos exposure cases is unavailable where the latency period is prolonged. For instance, at bar, it would have required Nemeth to start measuring the air quality in her bathroom for toxins approximately 40 years before she was diagnosed with the disease. 

Footnote 8:Contrary to WCD's claim, Dr. Moline's testimony on transvaginal exposure in women was not limited to general causation of ovarian cancer. Although one study she relied on concerned ovarian cancer, her testimony was more generally about the ability of dust to enter a women's body through her vagina. Ultimately, the trial court properly concluded that the deficit in plaintiff's counsel's characterization of Dr. Moline's testimony during summation was not about her general conclusion, that asbestos contaminated talcum powder can enter a women's body transvaginally, but that she did not conclude that Nemeth's mesothelioma was caused by transvaginal exposure to asbestos in DFTP.

Footnote 9:All defendants in this action other than WCD settled with plaintiff or were otherwise dismissed from the case before trial. Shulton, Inc., the manufacturer of Desert Flower, was one of the settling defendants. The jury apportioned fault for Mrs. Nemeth's injuries 50/50 between Shulton and WCD. As discussed more fully below, the settling defendants other than Shulton did not appear on the verdict sheet.

Footnote 10:Peritoneal mesothelioma is cancer of the lining of the peritoneum, the abdominal wall.

Footnote 11:Even if (as the majority seems to assume) the level of Mrs. Nemeth's exposure to asbestos could be deemed to be shown by plaintiff's geological expert's estimate that 2,760,000 asbestos fibers would have been released each time she used Desert Flower, this would not cure plaintiff's aforementioned failure to present evidence establishing the level of asbestos exposure necessary to cause peritoneal cancer.

Footnote 12:Because plaintiff's failure to establish the element of specific causation, standing alone, entitles WCD to judgment in its favor, I need not discuss WCD's two other arguments for dismissing the complaint as against it, namely, that plaintiff failed to establish general causation — i.e., that asbestos in cosmetic powder is capable of causing peritoneal cancer (see Parker, 7 NY3d at 448) — and that plaintiff failed to present sufficient evidence that WCD supplied asbestos-contaminated talc for the manufacture of Desert Flower. Even if WCD were not entitled to dismissal of the complaint, it would be entitled to a new trial by the trial court's error in failing to issue a curative instruction to the jury to correct an improper and materially prejudicial statement made by plaintiff's counsel in the course of his summation. I will discuss the latter issue at the conclusion of this dissent.

Footnote 13:It is not clear from the decisions cited above whether the Court of Appeals considers a showing of the level of exposure sufficient to cause an illness to be a component of general causation or a component of specific causation. Here, for the sake of streamlining the discussion, I have elected to treat proof of the sufficient level of exposure as a component of specific causation. However, the analysis would be no different if such proof were treated as a component of general causation.

Footnote 14:The remaining articles discussed by Dr. Moline similarly fail to address the question of the level of asbestos exposure required to produce peritoneal mesothelioma. An article entitled "Asbestos in commercial cosmetic talcum powder as a cause of mesothelioma in women," while setting forth autopsy findings from the lungs of a woman who contracted an unspecified variety of mesothelioma after using an unidentified brand of cosmetic powder, estimates neither that woman's level of environmental asbestos exposure nor the level of such exposure sufficient to cause any variety of mesothelioma. Another article (Gamble) is an X-ray study of the chest conditions of talc miners and millers who had not been diagnosed with any disease. Two articles (Roggli 1994 and Roggli 2002), while finding an association between asbestos exposure and certain diseases, offer no estimate of the level of exposure required to produce a disease. An article entitled "Cosmetic Talc and Ovarian Cancer" addresses a disease that, as Dr. Moline acknowledged, "is not the type of cancer we're talking about in this particular case." Finally, the last two articles (Rohl and Paoletti) were not even studies of human health effects.

Footnote 15:I do not understand the majority's point in stating that "controlled dose response studies concerning unsafe levels of asbestos exposure can[not] be ethically conducted in humans." If the majority means to suggest that I take the position that causation cannot be proved in an asbestos case in the absence of such unethical studies — which presumably do not exist — that is a suggestion to which I need not even respond. This leaves the question of why the majority chooses to make this point.

Footnote 16:To the extent the articles discussed in Dr. Moline's testimony have themselves been placed in the record, they do not remedy the gap in plaintiff's proof.

Footnote 17:The sample of Desert Flower used for the test was, according to Mr. Fitzgerald, a package of the product advertised as dating from the 1960s, which he had purchased online. I note that I find it unnecessary to reach the issue WCD raises as to Mr. Fitzgerald's qualification to opine on Mrs. Nemeth's exposure to asbestos from her use of Desert Flower.

Footnote 18:Notably absent from the record is any attempt by Mr. Fitzgerald to estimate the amount of asbestos that Mrs. Nemeth actually respirated while using Desert Flower in her bathroom by comparing his estimate (based on the glove box test) of the asbestos concentration in the air of her bathroom to the ratio of (1) a person's estimated respiration of asbestos from the ambient air (60,000 fibers per day, according to Mr. Fitzgerald's testimony) to (2) the estimated asbestos concentration in the ambient air. It is also remarkable that Mr. Fitzgerald never expressed his estimate of Mrs. Nemeth's cumulative asbestos exposure from Desert Flower by the scientific measure prescribed for this purpose by the Occupational Safety and Health Administration (OSHA). As Dr. Moline discussed in her testimony, under OSHA rules, workplace asbestos exposure is expressed in terms of fibers per cubic centimeter (f/cc) on a time-weighted average basis (see 29 CFR § 1910.1001[c][1]). This measure was employed by the plaintiff's expert in one of the cases on which the majority and plaintiff rely (see Matter of New York City Asbestos Litig. [Miller], 154 AD3d 441 [1st Dept 2017], lv denied 30 NY3d 909 [2018], affg 2016 NY Slip Op 30765[U], *10 [Sup Ct, NY County 2016]). With regard to the time-weighting factor, it should be borne in mind that Mrs. Nemeth's daily exposure to the Desert Flower dust lasted only five minutes, not for a more sustained period, as is typical in cases of occupational asbestos exposure.

Footnote 19:As noted in Dr. Moline's report, before the relevant defendants settled, plaintiff alleged that, in addition to Desert Flower, Mrs. Nemeth had been exposed to asbestos from: (1) construction materials she worked with while renovating her home; (2) lawn care products she used while gardening; and (3) dusty work clothes that she laundered for her son. At trial, the court ruled that WCD failed to make a prima facie case for apportioning fault to any of the settling defendants other than Shulton. Since plaintiff successfully sought this ruling, he would be judicially estopped to argue that Mrs. Nemeth's illness was caused by her cumulative asbestos exposure from Desert Flower and all other alleged sources. While WCD, on appeal, challenges the exclusion of the settling defendants other than Shulton from the verdict sheet, I find it unnecessary to reach this issue.

Footnote 20:As previously noted in footnote 11 of this writing, while it seems to me that such an extrapolation from the glove box test might have been feasible, Mr. Fitzgerald did not testify to having conducted any such analysis. Such an analysis was needed, inasmuch as, to state the obvious, a glove box is not a bathroom. Moreover, as discussed in the article in the record co-authored by Mr. Fitzgerald (the aforementioned "Asbestos in commercial cosmetic talcum powders as a cause of mesothelioma in women"), it is possible to conduct a test in an actual bathroom of the level of exposure to respirable asbestos resulting from the use of a cosmetic powder. Mr. Fitzgerald, however, did not conduct any such test with Desert Flower in a bathroom the size of Mrs. Nemeth's.

Footnote 21:Insofar as relevant to this case, the Court of Appeals' memorandum decision in Juni states: "Viewing the evidence in the light most favorable to plaintiff, the evidence was insufficient as a matter of law to establish that defendant Ford Motor Company's conduct was a proximate cause of the decedent's injuries pursuant to the standards set forth in [Parker] and [Cornell]. Accordingly, on this particular record, defendant was entitled to judgment as a matter of law under CPLR 4404(a)" (32 NY3d at 1118 [footnote omitted]). Contrary to the majority's assertion that only "two [Judges of the Court of Appeals] joined" this memorandum decision, both of the Judges who wrote concurring opinions expressly joined the memorandum decision, as well (see id. ["I join the majority's memorandum decision"] [Fahey, J.]; id. at 1119 ["I concur in the Court's opinion"] [Wilson, J.]).

Footnote 22:For this reason, I regard as superfluous the dicta of this Court's Juni majority opinion seeking to harmonize Lustenring v AC & S, Inc. (13 AD3d 69 [1st Dept 2004], lv denied 4 NY3d 708 [2005]) with the Court of Appeals' subsequent (2006) Parker decision. Whether or not the two decisions can be reconciled, Parker is the precedent by which this Court is bound.

Footnote 23:The majority's paraphrase of the italicized statement by the trial court picks the words "can cause peritoneal mesothelioma" out of their context to change the import of the statement into the reverse of what the court meant. In essence, the majority turns the court's statement on its head. Specifically, as can be seen from the fuller quote I have provided, and contrary to the majority's assertion, the trial court did not "observe[] that Dr. Moline had, in fact, testified that transvaginal exposure to asbestos contaminated talc can cause peritoneal mesothelioma'" — quite the opposite, in fact.

Footnote 24:It is therefore irrelevant that WCD did not object to Dr. Moline's testimony about the article positing a link between ovarian cancer and pelvic exposure to asbestos. As the trial court recognized, that testimony did not support the inference plaintiff's counsel asked the jury to draw in the summation comments at issue, to which WCD did object.

Footnote 25:Plaintiff's counsel compounded the prejudice of his remarks about transvaginal exposure by immediately following them up with this conclusion of his argument on the exposure issue: "Now it's just a matter of linking the dots of how she actually used it. You have to ask yourself this, did I tip those scales, is it more likely than not that she was exposed to this product given everything we already talked about. The answer is again unquestionably yes."